# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| REEMA SURGIT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-CV-07630 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Reema Surgit is a former Chicago Police Officer who alleges that the City of Chicago engaged in employment discrimination against her. R. 74, Third Am. Compl.[1] Surgit alleges that she suffered discrimination based on her race, national origin, color, gender, and religion—and that, ultimately, the City fired her for those discriminatory reasons. Her claims specifically arise from Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000(e) *et seq*, and the Illinois Human Rights Act, 775 ILCS § *5 et seq*.[2] Chicago has filed a motion for summary judgment, arguing that Surgit failed to exhaust her administrative remedies as to the discrimination claims based on color or religion, and that the merits of her remaining claims fail. R. 85, Def.'s Summ. J. Mot., R. 86, Def.'s Br. For the reasons discussed in this Opinion, Chicago's motion is granted.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]This Court has subject matter jurisdiction over the federal question claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

## I. Background

In deciding the City's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Having said that, when Surgit fails to present facts properly under Local Rule 56.1, the Court may deem the City's facts to be admitted and set aside Surgit's assertions. *See Delapaz v. Richardson*, 634 F.3d 895, 899–900 (7th Cir. 2011) (describing the importance of Local Rule 56.1 and the trial court's enforcement of it). The facts below are undisputed unless otherwise noted, in which case the evidence is viewed in Surgit's favor (so long as she properly presented evidence under Local Rule 56.1).[3]

Surgit is a female, Muslim, Arab-American of Middle Eastern descent; her family originally hales from Saudi Arabia. DSOF ¶ 1[4]; Third Am. Compl. ¶ 6. In mid-December 2017, she became a Probationary Police Officer (a job title known by its acronym, PPO) with the Chicago Police Department. DSOF ¶ 4; R. 87-2 at 11,

---

[3]As a threshold matter, the City argues that parts of Surgit's response to Chicago's L.R. 56.1(b)(3) Statement of Facts (Pl.'s Resp. DSOF) should be struck. Chicago argues that many of Surgit's responses do not actually refute Chicago's facts or and that other responses present extraneous information. But the response properly admits facts from the defense statement of facts when appropriate, and to the extent that Surgit argues that an assertion is not fully correct, her response offers the additional necessary information or context. So the Court generally will credit Surgit's 56.1 Response statement to the extent that she properly presents evidence under Rule 56.1.

[4]Citations to the parties' Local Rule 56.1 Statements of Fact are as follows: "DSOF" for Chicago's Statement of Facts [R. 87], "Pl. Resp. DSOF" for Surgit's response to Chicago's Statement of Facts [R. 98], "PSOF" for Surgit's Statement of Additional Facts [R. 98-1], and "Def. Resp. PSOF" for Chicago's response to Surgit's Statement of Additional Facts [R. 100].

Assignment History.[5] She began her employment at the 25th District, and was then transferred to the 1st District in late September 2018. DSOF ¶¶ 6, 19; Assignment History. Surgit served there until she was fired on May 11, 2019. DSOF ¶ 1; Pl. Resp. DSOF 1.

As the job title suggests, PPOs are probationary employees who are undergoing training and serving in a probationary capacity before becoming a police officer. This includes training cycles in the field upon graduating from the police academy, during which a PPO is partnered with a Field Training Officer (FTO). DSOF ¶ 5. The FTOs memorialize the progress and tribulations of the training in written Daily Observation Reports and Cycle Summary Reports. *Id.* ¶¶ 5, 11. During Surgit's first training cycle, Officer Robert Hvorcik served as Surgit's FTO. *Id.* ¶ 6; R. 97-6 at 186–214, Hvorcik Evaluations. Hvoricik's Summary Report details that, in her first training cycle, Surgit was having difficulty with navigation even after re-reviewing navigation and patrol procedures several times. DSOF ¶ 11; R. 87-6 at 215–16, Hvorcik Summary Report. Surgit was given beat maps (that is, neighborhood patrol areas) of each beat that fell within the district and was instructed to review the streets and to "remember which names and which 100 north or west main streets [were] within the district," but she failed to do so. DSOF ¶ 11; Hvorcik Summary Report at 216. When Surgit was offered guidance or feedback, she "argue[d] with FTO over PPO's

---

[5]For clarity and given the volume of the record, citations to the parties' exhibits are identified by their ECF PDF pagination within the docket record number. The exhibits have not been otherwise consistently labeled or separated in the submissions.

mistakes." *Id.* Hvorcik also detailed Surgit's challenges with driving at high speeds; during the last day of the first cycle, "while responding to calls with a priority 1 PPO panicked while driving over 40 mph with emergency lights activated on the last day." *Id.*

Surgit responded to the Summary Report with written comments. On the navigational issues, she asserted that she "did learn the main streets within the district" but was having difficulty with small streets because she was not familiar with the area. DSOF ¶ 12; Hvorcik Summary Report at 216. Likewise, she admitted to panicking while driving because she "wasn't familiar yet with the streets" and claimed that Hvorcik "constantly screamed at her and didn't trust her driving," and she went on to say that "he didn't give her a chance to think and repeated 'come on.'" DSOF ¶ 12; Hvorcik Summary Report at 216. Hvorock later testified that he reviewed navigation "almost every day" to try and assist with this problem, but that Surgit was still struggling at the end of her first cycle. DSOF ¶ 13; R. 87-10 at 48, Hvorcik Dep. at 19:8–11. Surgit denies that they reviewed navigation "constantly." Pl. Resp. DSOF ¶ 11; R. 98-2 at 1–3, Surgit Decl. at ¶ 11. Hvorcik did also write in his Summary Report that "PPO is slowly getting the policy's [sic] and procedures of being a police officer." DSOF ¶ 11; Hvorcik Summary Report at 216.

During her final training cycle, Surgit was under the supervision of Officer Tewelde Tesfai. DSOF ¶ 14; R. 87-6 at 236–55, Tesfai Evaluations. Tesfai noted some issues with Surgit's demeanor in some of his Daily Observation Reports, noting that "PPO does not take criticism very well, becomes very defensive." DSOF ¶ 14; Tesfai

4

Evaluations at 242. After the officers made a DUI arrest, Tesfai started to give Surgit feedback and constructive criticism about how the incident was handled, but Surgit "related that she was dizzy, does not feel good and needed to go home," so she was excused. DSOF ¶ 14; Tesfai Evaluations at 238–39. The following day she again said that she was not feeling well and needed to sit—but was later found socializing with other officers. DSOF ¶ 15; Tesfai Evaluations at 243. After this training cycle, Surgit was ultimately certified for the field. The final Summary Report graded her with an overall performance level of three in the majority of categories (five being a top score), except for Demeanor and Attitude (in this category she received a one, the lowest score possible). R. 87-6 at 257–58, Tesfai Final Summary.

Following her field qualification Surgit then started at the 1st District in September 2018. DSOF ¶ 19. During her time at the 1st District, Surgit described experiencing less friendly treatment than her peers. She was yelled at by Lieutenant Steven Konow on one occasion to "get the *** out of my office," DSOF ¶ 64; Surgit Dep. at 84:1–2, and at other times was told that he would "kick [her] out of the 1st district." DSOF ¶ 64; Surgit Dep. at 83:20. Surgit also felt that Konow was generally less friendly to her compared to her peers. R. 74-1, EEOC Charge and Inquiry at 7.

After trainees complete their field cycles, they remain a probationary officer and subject to continued evaluation during the overall 18-month PPO period. At the 15-month mark of Surgit's employment, Sergeant Jeffery Burke completed an evaluation of Surgit. DSOF ¶ 48; R. 87-9 at 19–20, 15 Month Eval. In his evaluation, Burke expressed that "I have noticed that PPO Surgit struggles and is lacking in some basic

5

report writing skills." DSOF ¶ 48; 15 Month Eval at 19. He explained that for depart-ment reports, Surgit failed to follow the directions listed on the reports, did not com-plete all the necessary boxes, and left out information required by general orders on the reports. *Id.* Burke recommended that "Surgit read[] more general orders in order to become more proficient in report writing and know what is required in specific reports." *Id.* Out of 12 categories, Burke rated Surgit's performance level as "profi-cient" on 11 and "deficient" on category three: report writing. *Id.*

After Burke's 15-month review, Surgit was reviewed by Sergeant Marty Chatys of the Field Training and Evaluation Review Board. DSOF ¶¶ 48–49; R. 87-11 at 10–28, Chatys Dep. at 23:16–19. Because Chatys was not familiar with Surgit before this review, he requested a so-called "to/from memorandum" from Konow. Konow's memorandum requested that Surgit be retrained. DSOF ¶¶ 49, 51; Chatys Dep. at 14:22–15:1; R. 87-7 at 2–3; Konow Mem. Chatys then convened a Review Board. DSOF ¶ 53; Chatys Dep. at 34:14. The Board reviewed Konow's memorandum, training cycle reports, and disciplinary history, among other things. DSOF ¶ 53. The Board voted 5-0 in favor of Surgit's separation. R. 87-4 at 19–27, Review Board Memo. Surgit was then discharged. R. 98-6 at 165–73, Personnel Order.

After her employment was terminated, Surgit filed a charge of discrimination with the U.S. Equal Opportunity Employment Commission (EEOC). EEOC Charge and Inquiry. Surgit's charge selected race, sex, and national origin for the identities she was discriminated based on, and listed May 13, 2019, or the day of her termina-tion, as the earliest and latest day the discrimination took place. EEOC Charge and

6

Inquiry and Inquiry at 3. In her discussion with the EEOC investigator, Surgit ex-
plained that she felt she was treated differently compared to others by Konow because
he never stopped by her workstation, he seemed not to like her from the start of her
employ, and spoke to her harshly on some occasions. *Id.* at 7. Surgit's EEOC filing
triggered an automatic cross filing with the Illinois Department of Human Rights
(IDHR), which then requires a notification of the EEOC's findings within 30 days of
their occurrence. The EEOC closed Surgit's claim on August 29, 2019, stating that
the agency was unable to conclude that there was a violation of the relevant antidis-
crimination laws. EEOC Charge and Inquiry and Inquiry at 2. Surgit did not notify
IDHR.

Surgit then filed a complaint in this case, R. 1, eventually amending it thrice.
R. 13, First Am. Compl., R. 39, Second Am. Compl., R. 74, Third Am. Compl. She
alleged that Chicago violated Title VII, 42 U.S.C. § 2000e, and the Illinois Human
Rights Act, 775 ILCS 5/6-101(A), by discriminating on the basis of her race, ethnicity,
sex, and religion. Third Am. Compl. at 8–12. After the close of discovery, Chicago
moved for summary judgment. Def.'s Summ. J. Mot.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the
evidence is such that a reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

7

summary judgment motions, courts must view the facts and draw reasonable infer-ences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judg-ment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. IHRA Claims

The Court first examines Surgit's claims under the Illinois Human Rights Act (IHRA). Claims under the IHRA must undergo proper administrative exhaustion. *Garcia v. Vill. of Mount Prospect*, 360 F.3d 630, 640 (7th Cir. 2004). Before initiating suit under the IHRA, "plaintiffs must file a charge of discrimination with the Illinois Department of Human Rights (IDHR) … a complainant may then file a civil suit after (1) she receives a final report from the IDHR, or (2) the IDHR fails to issue a report

8

within a year after the charge is filed." *Baranowska v. Intertek Testing Servs. NA, Inc.*, 2020 WL 1701860, at *3 (N.D. Ill. Apr. 8, 2020) (cleaned up).[6]

When a charge is filed with the EEOC in Illinois, it is then automatically cross-filed with the IDHR. *See* 775 ILCS 5/7A-102(A-1)(1). The IDHR will "take no action" until the "EEOC makes a determination on the charge and after the complainant notifies the Department [of Human Rights] of the EEOC's determination." *Id.* Afterwards, the IHRA requires that the complainant "submit a copy of the EEOC's determination within 30 days after service of the determination by the EEOC on complainant." 775 ILCS 5/7A-102(A-1)(1)(iv). At that time the IDHR will either accept this determination or begin an independent investigation. *Id.*

Upon filing her EEOC Charge on August 19, 2019, Surgit received notification that it was automatically cross-filed with the IDHR and that she was required to notify the IDHR of the EEOC's findings within 30 days of receipt. DSOF ¶¶ 71–72, 77–78; R. 87-11 at 68, IDHR Letter. But after receiving the EEOC's Dismissal and Notice of Rights on August 26, 2019, she did not notify the IDHR of the EEOC's determination within 30 days of receiving it. DSOF ¶ 78; R. 87-11 at 67, FOIA Cover Letter. Because the Department was not notified of any intent to proceed in writing, the IDHR did not investigate Surgit's claims. DSOF ¶ 78; FOIA Cover Letter. Because Surgit failed to notify the IDHR, she failed to exhaust her administrative

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

remedies with regard to her IHRA claim. *Cf. Jafri v. Signal Funding LLC,* 2019 WL 4824883 (N.D. Ill. Oct. 1, 2019); *Donald v. Chicago,* 2021 WL 1946335 (N.D. Ill. May 14, 2021). Summary judgement is therefore granted as to this claim.[7]

## B. Religious Discrimination and Color Discrimination

Just as the IHRA contains an exhaustion requirement, a party asserting a claim under Title VII must also exhaust administrative remedies through the EEOC. 42 U.S.C. § 2000e-5. *See also Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110 (7th Cir. 1992); *Cervantes v. Ardagh Group,* 914 F.3d 560, 564 (7th Cir. 2019). "Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Sitar v. Indiana Dep't of Transp.,* 344 F.3d 720, 726 (7th Cir. 2003); *Cheek v. W. & S. Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994). This allows the EEOC and the employer a chance to address the dispute and offer warning around the relevant conduct. *Id.* "The only qualification to this principle applies to claims that are like or reasonably related to the EEOC charge, and can be reasonably expected to grow out of an EEOC investigation of the charges." *Sitar,* 344 F. 3d at 726 (cleaned up). This is the case when the claim at issue and the EEOC Charge "describe the same conduct and implicate the same individuals." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.,* 804 F.3d 826, 831–32 (7th Cir. 2015).

---

[7]The Court notes that Surgit did not respond in any way to the City's argument that she failed to exhaust her IHRA claim. It would have been preferable for Surgit to expressly concede or otherwise address this argument, rather than to stay silent and to compel the Court to read, re-read, and re-re-read her brief to make sure that the responsive argument had not been missed.

As explained in this Court's opinion deciding the dismissal motion, to account for the fact that many employees who file discrimination charges are not attorneys, the Seventh Circuit has held that allegations in EEOC charges should be viewed expansively when deciding whether a particular claim is within the scope of the charge. R. 64, MTD Mem. Op. at 8. *See also Hottenroth v. Vill. Of Slinger*, 388 F.3d 1015, 1035 (7th Cir. 2004) ("[B]ecause EEOC complaints are most often compiled without the assistance of counsel, we afford plaintiffs considerable leeway and ask only whether a claim set forth in the complaint is like or reasonably related to the allegations of the charge and growing out of such allegation."). Although failure to select a box indicating discrimination under a certain category can bear on the analysis of a discrimination claim related to that category, a plaintiff suing under Title VII can still successfully "pursue a claim not explicitly included in an EEOC complaint … if her allegations fall within the scope of the earlier charges contained in the EEOC complaint." *Sommerfield v. City of Chicago*, 863 F.3d 645, 648 (7th Cir. 2017) (cleaned up). *See also Luevano v. Wal-Mart Stores, Inc.,* 722 F.3d 1014, 1030 (7th Cir. 2013) (cleaned up).

Surgit argues that she experienced religious discrimination in violation of Title VII. But Surgit's *pro se* EEOC Charge failed to select "religious discrimination" among the boxes. *See* EEOC Charge and Inquiry at 3. Surgit claims that this was a "naïve failure to check the appropriate boxes on her initial complaint form." R. 97, Pl. Resp. at 1, and that "the full EEOC record contains allegations that the Plaintiff was discriminated against based upon her religion." *Id.* at 9–10; Pl. Resp. DSOF ¶ 74. But

Surgit fails to specify the allegations which relate to religious discrimination, instead only asserting that a "claim of religion *could have* developed from the EEOC's investigation." Pl. Resp. at 10 (emphasis added).

Nothing in the EEOC Charge or record, even with an expansive interpretation, can be seen as covering religious discrimination. Surgit's Charge simply alleges that she experienced discrimination due to "my race, Asian, my national origin, Middle Eastern, and my sex, female." EEOC Charge and Inquiry at 3. As this Court explained at the dismissal stage, "Surgit's claims of race, national origin, and sex discrimination provide no basis to which to relate a religious discrimination claim." MTD Mem. Op. at 11. First, Surgit did not identify her religion to the EEOC investigator at any point. EEOC Charge and Inquiry at 7. Rather, she relies on the fact that she claims national origin discrimination and her family originates from a majority-Muslim region. But "[i]f that is right, then courts would have to read religious discrimination into every complaint of race or national original discrimination filed by a plaintiff from a nation (or region) with a majority of adherents to one faith." MTD Mem. Op. at 12.

Surgit cites to *Sommerfield* for the proposition that a religious discrimination claim "reasonably could have developed from the EEOC's investigation." Pl. Resp. at 9–10; *see Sommerfield*, 863 F.3d at 648. But asserting this without providing more is inadequate. Indeed, in *Sommerfield*, the court held that a hostile work environment claim could not be supported by an original EEOC Charge that did "no more than describe verbal abuse … it does not refer to any other people or conduct." 863 F.3d at

649. Just so here. The only relevant fact reflected in the EEOC record is that "[s]ince day one she felt not liked, Konow never addressed her, not friendly towards her, he would ignore her but pay attention to others." EEOC Charge and Inquiry at 7. When Surgit was asked about any specific comments from Konow related to her national origin, race, or sex, Surgit's reply to the investigator was that the issue "[m]ostly was with his attitude," a perception that he "never stopped by said hi to her, did not like her from [day one], he wanted her to shut up not say anything." *Id.* Although obviously unpleasant, the instances of verbal abuse and lack of collegiality Surgit spoke about to the EEOC investigator lacks any type of connection to her religion. So summary judgment is granted as to Surgit's religious discrimination claim.

For similar reasons, Surgit's arguments that the record supports a color-discrimination claim, despite not having selected this box in her original EEOC Charge, also miss the mark. "The crucial element used to determine the scope of the charge is the allegations in the factual narrative." *Zubek v. City of Chicago*, 2006 WL 1843396, at *2 (N.D. Ill. July 5, 2006) (cleaned up). Surgit's written description focuses not on color but instead on race, her national origin, and her sex. The EEOC investigator's notes also do not specify Surgit's skin color and how she was treated differently as a result.

At most, the EEOC investigator's notes only reflect an oral statement from Surgit where she alleged that "[Konow] has a long history of discriminating against people of color," EEOC Charage at 7, but Surgit does not go further to explain any specific color discrimination she experienced at the hand of Konow, focusing only

13

generally on his "attitude." *Id.* At bottom, Surgit did not set forth any other facts in the Charge's description section or through her intake discussion that are reasonably related to color discrimination. Because the EEOC record "lack[s] any specificity or detail regarding discrimination based on [color or religion]," Surgit "provided no notice to the EEOC and the City of Chicago that [religious and color discrimination] … were issues for investigation and conciliation efforts." *Id.* at *3 (cleaned up). *See also Rufus v. City of Chicago,* 2018 WL 1911799, at *3 (N.D. Ill. Apr. 23, 2018). Summary judgment is thus granted as to Surgit's color discrimination claim.

### C. Hostile Work Environment

The Court turns next to Surgit's hostile work environment claim. "A condition precedent to bringing a Title VII hostile work environment is that the employee must have afforded the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Hottenroth*, 388 F.3d at 1035 (cleaned up). *See also Cheek*, 31 F.3d at 497.

Surgit again failed to exhaust her remedies with respect to this claim. First, Surgit's Charge listed the *earliest* date that discrimination took place as the date of her termination, EEOC Charge and Inquiry at 3. A hostile work environment would have occurred over a time period earlier than just on the termination date. *See Radek v. Target Corp.*, 2017 WL 6733717, at *3–4 (N.D. Ill. Dec. 19, 2017) ("Where an EEOC charge is based only on an employee's termination, a hostile work environment claim that involves a separate set of incidents over a period of time preceding the termination is not sufficiently related to the EEOC charge."). Also, Surgit did not provide any

14

additional information in her EEOC Charge that alleged particular comments, improper conduct, or anything else that could "fairly suggest a hostile work environment, so such a claim fails." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013).

Though Surgit stated in her internal, pre-charge inquiry form that a lieutenant "created a hostile work environment from the day I started working at the district," EEOC Charge and Inquiry at 6, the EEOC Charge is distinct from this pre-charge inquiry form for administrative exhaustion purposes. *See Herrera v. Di Meo Bros., Inc.*, 529 F.Supp.3d 819, 828 (N.D. Ill. Mar. 29, 2021). Similarly, Surgit also argues the EEOC investigator was informed that she had "filed a claim on the same facts with the [Civilian Office of Police Accountability (COPA)] where the "Nature of Complaint" was a hostile work environment perpetrated by two lieutenants who 'collaborated and created a hostile work environment.'" Pl.'s Resp. at 10; s*ee* EEOC Charge and Inquiry at 4. But her mention of the COPA claim again is included in her pre-charge inquiry, *not* the EEOC Charge. In any event, relying on a cross-reference to allegations completely outside of the underlying EEOC process goes further than analyzing the Charge expansively to account for allegations that are logical outgrowths. This "would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Cheek*, 31 F.3d at 500.

Even assuming that Surgit survived exhaustion and taking the facts in the light most favorable to her, Surgit failed to establish the existence of a hostile work environment. "To state a Title VII hostile work environment claim, a plaintiff must

allege (1) she was subject to unwelcome harassment; (2) the harassment was based on her national origin or religion (or another reason forbidden by Title VII); (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). Critically, "[t]o rise to the level of a hostile work environment, conduct must be sufficiently severe or per-suasive to alter the conditions of employment such that it creates an abusive rela-tionship." *Huri*, 804 F.3d at 833–34.

The evidence falls short of that standard here. Surgit's pre-charge inquiry al-leges only generally that she "was mistreated … without knowing what was going on," and that she "was never greeted to talked to like my fellow officers from a differ-ent race." EEOC Charge and Inquiry at 6. The EEOC investigator's notes only sug-gest that Surgit felt disliked from that start, that Konow never addressed Surgit di-rectly, was not friendly towards her, and "would ignore her but pay attention to oth-ers." EEOC Charge and Inquiry at 7. Surgit points only to a handful of particular instances of verbal abuse by Konow—specifically that she was "cursed out" upon fail-ing an inspection, harshly told get out Konow's office, and was yelled at about being kicked out of the district. This record shows at most sporadic misconduct; the yelling, threats, and general unpleasantries described by Surgit, though no doubt unkind, have little connection to Surgit's national origin, race, or other protected category. Surgit only mentions race in the context of one set of hostilities, when she says that she was not greeted the same way as others "from a different race." EEOC Charge

16

and Inquiry at 6. But a lack of salutations alone is not severe enough to establish conditions so severe or pervasive as to alter the conditions of Surgit's employment. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002).

### D. Rase, Sex, & National Origin

The Court now turns to the merits of those claims that do survive the exhaustion requirement—Surgit's race, sex, and national-origin discrimination claims. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). *McDonnell Douglas v. Green*, 411 U.S. 792, (1973) offers a burden-shifting framework to be applied in proving employment discrimination under Title VII. To establish a prima facie case of discrimination under *McDonnell Douglas*, a plaintiff must show that: "(1) she belongs to a protected class; (2) she met Defendant's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably." *Rogers v. DeJoy*, 2021 WL 4318083, at *4 (N.D. Ill. Sept. 23, 2021); *Gamble v. Fiat Chrysler Autos. U.S. L.L.C.*, 993 F.3d 534, 537 (7th Cir. 2021). Once the plaintiff has satisfied each element of a *prima facie* case, "the burden shifts to the employer to offer a non-discriminatory motive, and if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Gamble*, 993 F.3d at 93. The relevant inquiry is "whether the other employees' situations were similar

17

enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (cleaned up)." [8]

Surgit fails to make a prima facie case of discrimination on the basis of race or sex. Though Surgit belongs to protected classes as a woman of Middle Eastern descent, she did not meet the City's legitimate job expectations. "[W]hen a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is … whether the employee was performing well at the time of her termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (cleaned up). In analyzing an employer's stated evaluation of those expectations, "[t]he question is not whether the ratings were right but whether the employer's description of its reasons is honest." *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992). Here, the Review Board that evaluated Surgit pointed to a handful of key deficiencies that supported the termination recommendation.

**Challenges with Driving.** First, the Review Board relied on Hvorcik's summary report, which explained that Surgit had difficulty with emergency driving; when responding to calls she panicked while driving typical speeds of 40 mph when

---

[8]In proving discrimination, of course a plaintiff may pursue alternatives to the *McDonnell Douglas* framework. A plaintiff may prove that she was impermissibly discriminated against by viewing the evidence as a whole and asking the totality is indicative of discrimination per *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). But Surgit has made no attempt at demonstrating discrimination under *Ortiz*, so the Court does not address this avenue.

the police vehicle's lights and sirens were activated. Hvorcik Summary Report at 215–16. Hvorcik also detailed that Surgit was having continued difficulty with navigation even after re-reviewing navigation and patrol procedures several times. *Id.* at 216. She was given beat maps of each beat that fell within the district and was instructed to review the streets and to "remember which names and which 100 north or west main streets [were] within the district," but she failed to do so. *Id.*

Surgit counters that the driving speeds were over 50 mph rather than 40. Hvorcik Summary Report at 215. At the same time, in her written response to the report, she conceded to "panicking … because she wasn't familiar yet with the streets." *Id.* She also contended that though she "did learn the main streets within the district" she was indeed having continued difficulty with small streets because she was not familiar with the area. *Id.* But even assuming that the vehicle was at 50 mph, Surgit did not meet the baseline expectations of a police officer in this regard— the panic and challenges with driving at high speeds required for emergency work, and failing to master the geography of the district (even with extra help), posed significant problems in Surgit showing that she could discharge the duties of an officer. Indeed, the Board explained that "emergency driving is an essential part of police work and an everyday occurrence for most police officers …. Surgit's lack of confidence in her driving techniques and her lack of general driving skills while operating a police car is clearly a problem." Review Board Memo at 166.

**Report Writing.** Next, the Review Board also found that Surgit did not meet expectations when it came to report writing, a basic skill required in day-to-day police

work. Review Board Memo at 168–69. During Surgit's third training cycle, this time under Tesfai, he noted that when Surgit was filling out a curfew report, she "forgot to include the guardian of the violator in the designated section." *Id.* at 167. In another incident, Surgit struggled to properly complete a traffic-crash report after responding to a multi-car traffic crash. Though Sergeant Maria-Lyn was giving specific instructions to Surgit on how to complete the report, it still ultimately had to be amended due to deficiencies. *Id.* at 168. In a later instance, Surgit was assisting with a battery investigation. The officer working with her at the time offered assistance, but Surgit failed to take his advice and even with additional help from Sergeant Burke, she struggled in completing the report. *Id.* at 169. Konow, when recounting the incident in his to/from report relied on by the Board, explained that it took an "extraordinary amount of time and direct guidance" for Surgit to finally submit "an acceptable case report." *Id.*

Surgit also failed to properly fill out a report for overtime or compensatory time, submitting it with the incorrect unit, watch, and improperly formatted date. Review Board Memo at 169. It was after this last incident that Surgit was assigned to work with a high-performing officer to improve her report-writing skills, but Surgit took feedback poorly from the officer. *Id.* The Board also noted that Burke's 15-month evaluation of Surgit made note of the same themes. He wrote: "as one of PPO Surgit's supervisors … I have noticed that PPO Surgit struggles and is lacking in some basic report writing skills. A couple of examples are not following the direction listed on department reports, filling in the necessary boxes on department reports[,] and

leaving out important and necessary information." *Id.* at 168. Burke's recommendation was that she read more general orders to better understand what is required in specific reports. *Id.*

For her part, Surgit's response to these incidents is sparse and primarily consists of denials without any additional explanation of the circumstances. Surgit simply asserts that she "did not make numerous errors when filling out reports," "did not constantly seek advice for writing case reports," and "did not use 'wrong terminology' when completing reports," Surgit Decl. ¶¶ 6, 9, 10; Pl. Resp. at 2, without offering any specific explanation or counterexamples. Surgit argues that the City is unable to produce any report or document in which she made a single error, *id.,* ignoring the examples relied upon by the Review Board.

**Demeanor.** The Board also "clearly noticed a pattern developing" around Surgit's "fail[ure] to follow verbal direction and take … initiative." Review Board Memo at 166. The Board found that Surgit had a poor attitude, was argumentative, and was regularly unable to accept constructive criticism. *Id.* During her third training cycle, Surgit assisted with a DUI investigation arising from a traffic stop, during which she accidentally locked her key inside the squad car with the suspect, and misunderstood the proper observation period for the suspect. When Tesfari went to "give [her] feedback and constructive criticism regarding the incident," he was unable to do so, as she "related that she was dizzy, does not feel good and needed to go home." *Id.* at 167.

21

The Board also pointed to a later report from Tesfari which noted that "PPO is very defensive when FTO tries to give a constructive criticism. PPO is always referencing her previous cycles as to why she did what she did." Review Board Memo at 167. Surgit's written response to the report was that she was ill "while FTO think[s] she was making excuses that day and the day before. PPO asked to set (sic) down and didn't know what FTO was doing because he doesn't communicate with her." *Id.* Even crediting Surgit's assertion that she was unwell during those two days, Tesfari's overall Cycle Summary Report suggested a more general pattern of Surgit's refusal to accept feedback. Whenever Tesfari "tried to help … PPO was quick to blame her previous FTOs on her poor performances. PPO is very defensive when receiving a constructive criticism or made aware of a mistake and always made excuses. PPO doesn't accept responsibilities or accountability for her action or shortcomings, always looked for someone to blame or a scapegoat." *Id.* at 168. At the time of this summary report's issuance, Surgit reviewed and approved the report without adding any additional comments. *Id.*

Tesfai did note that upon raising this behavior to his lieutenant and captain, they addressed Surgit, and she apologized, saying that "she was going to listen more and accept responsibilities for her actions." Review Board Memo at 168. But this attitude did not seem to improve despite Surgit's proffer of receptivity. Almost one year later, when Surgit was paired with a high-performing officer to help address her report-writing issues, "six hours into their first tour, the officer stated … that Surgit was *very unreasonable* when suggestions were made with her reports." *Id.* at 169

22

(emphasis added). Surgit's only response is that she was never informed that others were trying to help her with her report writing. PSOF ¶ 16; Surgit Decl. at ¶¶ 18, 19. But her lack of awareness around the pairing does not change the fact that she was unreasonable in the face of that officer's suggestions.

Surgit also argues that the City cannot identify any officer who complained about her or who did not want to work with her due to her attitude. Pl.'s Resp. at 6. But the lack of additional examples from her *peers* does not rebuff the detailed chronicle of attitude problems identified by Surgit's FTOs during her training, and by Burke in his 15-month review. Put simply, Surgit failed to meet the legitimate expectations of CPD when it came to the demeanor and acceptance of feedback required for the job of a police officer. The Review Board found that after being given opportunities to improve—ranging from serious conversations to being paired with strong officers—Surgit showed little sign of improvement.

**SPARs for Inattention to Detail/Carelessness.** The Review Board also relied on examples where Surgit received Summary Punishment Action Reports (SPARs) for demonstrating carelessness, including failing to appear in court, accidentally discharging a taser, and failing to submit a change-of-address form in a timely manner. Surgit argues that she was never formally notified of her court dates and did not understand the expectations for checking the internal system until she had already received two SPARs for failing to do so. Pl.'s Resp. at 5. On the change-of-address issue, Surgit contends that she properly filed a change-of-address form,

but that it was never entered by CPD, and that as a result, her SPAR was later reduced to a "no discipline" infraction. *Id.* at 6.

Even when crediting Surgit on the disputed context of these SPARs, Surgit failed to meet her employer's legitimate expectations. In moving to terminate her, the Review Board relied on concrete examples in three other arenas unrelated to the SPARs: Surgit's failure to properly complete all manner of reports, Surgit's inability to adjust in response to generative feedback or criticism, and Surgit's navigational challenges.

In any event, Surgit is unable identify similarly situated employees outside her protected class who received better treatment. Surgit points only to Officer Robert Bakker as an example of someone who was treated differently. First, she points out that Officer Bakker was late to appearing on his first day just as Surgit was. RSOF ¶ 62; Surgit Dep. at 134:18-136:11. Second, she points to an admonishment during an inspection at which both of them were present. During the inspection, Surgit did not have her ID and was reprimanded for being unable to present it, but claims Officer Bakker similarly did not have his identification and did not receive the same treatment.

To the extent that Surgit points to these examples as discrimination on the basis of her race or sex, neither of these facts—Surgit's tardiness or her inspection failure—led to her adverse employment action of termination. Neither were discussed in the Review Board's memorandum as reasons that the Board relied on in deciding to separate Surgit from her role. Rather, the major focus was on her report-writing

24

and demeanor deficiencies, which were the categories by which the Board found job expectations were not being met.

Surgit's overall circumstances are thus similar to the plaintiff in *Igasaki v. Illinois Department of Financial & Professional Regulation*: her "performance was at best, lackluster, and at worst, unacceptable." 988 F.3d 948, 958 (7th Cir. 2021). The Review Board's decision to terminate Surgit's employment was not based on any consideration of her protected characteristics, but rather on her continued deficiencies around core skills required for good police work. Even when the evidence is viewed in her favor, no jury could reasonably find otherwise.

Surgit is also unsuccessful in asserting that the Review Board's actions were pretextual per a "Cat's Paw" theory. "[C]at's paw liability may be imposed on an employer where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 992 (7th Cir. 2016). In such a situation, a "biased supervisor, or a biased subordinate, who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (cleaned up); *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017).

In this instance, a Cat's Paw theory would require that (1) the Review Board's decision was proximately caused by Konow, and (2) Konow harbored discriminatory animus against Surgit. But the proximate-cause element is not satisfied here. First,

25

Konow prepared the to/from memorandum, which recommended that Surgit be *re-trained*, not terminated. And this memorandum was prepared at the request of Chatys, after Surgit's 15-month review by Burke demonstrated a deficiency in report writing. It is not as if Konow prepared the memorandum out of any independent desire to start a discussion about terminating Surgit.

The Review Board, upon reviewing Konow's materials as well as Surgit's training reports and other performance records, voted for her termination rather than retraining. "An unbiased decision maker can break the casual chain." *Anderson v. Illinois Cent. R.R. Co.*, 2019 WL 1438567, at *12 (N.D. Ill. Mar. 31, 2019). Surgit offers no evidence that would suggest Konow influenced the decision to convene the Board, or that Konow influenced the Board in their ultimate 5-0 vote for termination.[9] *See Milligan-Grimstad*, 877 F.3d at 712. . Indeed, the Review Board relied on facts and examples beyond what Konow described in his initial memorandum. Even given the benefit of reasonable inferences, Surgit's Title VII claims are not saved by a Cat's Paw theory of discrimination.

---

[9]It is not necessary to address the animus element of the Cat's Paw theory (because no proximate causation is demonstrated), but the Court notes that Surgit also fails to show how Konow harbored discriminatory animus. There were two instances where Konow allegedly "cursed" at Surgit. DSOF ¶¶ 63–64, 70, 75. Surgit also described to the EEOC investigator that Konow was less friendly towards religious minorities. *Id.* This alone is insufficient to demonstrate animus. *See Anderson v. Illinois Cent. R.R. Co.*, 2019 WL 1438567, at *14 (N.D. Ill. Mar. 31, 2019) (holding that employee who explained that supervisor "he just had a very bad attitude towards us, I thought. And, to me, it felt like it was because of our nationality" failed to demonstrate animus).

## IV. Conclusion

The City of Chicago's motion for summary judgment is granted. The case is dismissed with prejudice as to the race, sex, and national-origin claims and without prejudice for failure to exhaust as to the Illinois Human Rights Act, religion, color, and hostile work environment claims.[10] The status hearing of April 7, 2023, is vacated. A separate final judgment shall be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2023

---

[10]Neither side argued that if the federal law claims are dismissed, then the Court should relinquish supplemental jurisdiction over the state law claims. Given the clarity of the result (failure to exhaust the Illinois Human Rights Act claims), it is appropriate to decide the state law claims here.